Case 2:13-cv-00070   Document 368   Filed on 05/01/25 in TXSD   Page 1 of 11

United States District Court
Southern District of Texas
**ENTERED**
May 01, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MICHAEL GARRETT, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. 2:13-CV-00070 |
| § | |
| ERIC GUERRERO, Director, § | |
| TEXAS DEPARTMENT OF CRIMINAL § | |
| JUSTICE-CORRECTIONAL § | |
| INSTITUTIONS DIVISION § | |
| § | |
| Defendants. § | |

**SUPPLEMENTAL AND REVISED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Michael Garrett (Garrett), while an inmate housed at the McConnell Unit of the Texas Department of Criminal Justice (TDCJ), prosecuted this action against Lorie Davis in her official capacity as Director of the TDCJ-Correctional Institutions Division.[1] Pursuant to the Civil Rights Act, 42 U.S.C. § 1983, Garrett seeks declaratory relief that TDCJ's 24-hour building schedule, along with the prison's excessive noise and light, fails to provide him with an opportunity to sleep continuously for at least six hours, in violation of his Eighth Amendment right against cruel and unusual punishment. The case was tried to the bench on November 13 and 14, 2018, and the Court previously entered its Findings

---

[1] A lawsuit against a governmental official in her official capacity is a suit against the state office she serves. *E.g., Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55 (1978). That office is currently held by Eric Guerrero. For ease of reference, Defendant will be referred to herein as TDCJ.

of Fact and Conclusions of Law on March 18, 2019. The Court held that Garrett had not sustained his burden of proof to demonstrate an Eighth Amendment violation. D.E. 225.

On Garrett's appeal, the Fifth Circuit Court of Appeals first entered an order remanding the case for a determination of whether the case was moot. That is because, after this Court's decision, TDCJ transferred Garrett to its Estelle Unit, a different prison facility. The question was whether the Estelle Unit was run with a different schedule and ambient conditions from those of the McConnell Unit. *Garrett v. Lumpkin*, 840 F. App'x 807 (5th Cir. 2021) (per curiam) (*Garrett I*); D.E. 298.

To address that fact question, the parties conducted additional discovery and submitted the matter to the Court on briefs accompanied by additional evidence. *See* D.E. 321. After reviewing the supplemental materials, this Court held that the case was not moot because the conditions at the new facility were substantially similar to those of the former facility and that Garrett still had not sustained his burden of proof. *Id*.

The Fifth Circuit then determined the merits of the appeal. It observed that the standard for Eighth Amendment conditions of confinement cases seeking declaratory or injunctive relief had been clouded by unpublished Fifth Circuit opinions that had, in turn, generated district court opinions that consistently diverged from the proper standard and which were also not published or subjected to review. Therefore, the Court chose this case to clarify the law. *Garrett v. Lumpkin*, 96 F.4th 896, 902 n.3 (5th Cir. 2024) (*Garrett II*); D.E. 337. The Fifth Circuit then articulated the standard to be applied, eliminating some of the considerations this Court had included in ruling in favor of TDCJ.

Consequently, the Fifth Circuit vacated this Court's prior decision and remanded the case for reconsideration under the proper standard. *Id*. at 902. After review of the supplemental materials, and applying the prescribed legal standard, the Court now enters its revised findings of fact and conclusions of law.

## PRELIMINARY ISSUES

On the merits-based remand, this Court afforded the parties a third opportunity to conduct discovery and then brief the case pursuant to the correct legal standard. *See* D.E. 339.[2] Discovery closed on July 22, 2024. Garrett timely filed his opening brief (D.E. 350) on September 23, 2024. In connection with that brief, Garrett filed what he knew to be the then-current Estelle Unit prison schedule (D.E. 350-2), which was certified by TDCJ as taking effect February 27, 2023. Among other things, that schedule showed that any opportunity for sleep between rack-up at 10:30 p.m. and breakfast at 4:00 a.m. was interrupted between midnight and 1:00 for a prisoner bed book count for which inmates must be awake. D.E. 350-2, pp. 3, 6.

TDCJ then timely filed its response brief (D.E. 358) on November 23, 2024, attaching a new prison schedule (D.E. 358-1) effective August 1, 2024, along with a new declaration from the Estelle Unit's warden. Warden Newton testifies that the midnight count is no longer a bed book count, but a count through which the inmates may sleep. This prompted Garrett to request, in its reply brief filed December 16, 2024, that the Court

---

[2] The Court granted numerous requests for extensions of time for both discovery and briefing. *See* D.E. 343, 346, 352, 360, 364.

disregard the new evidence or grant additional discovery. D.E. 361, pp. 2 n.1, 5, 12. Garrett also attached his affidavit of September 19, 2024, recounting his actual experience under the prison schedule then in effect, which would have been the August 1, 2024 schedule on which TDCJ relies. D.E. 361-3.  In a sur-reply, TDCJ suggested that an evidentiary hearing would be preferable to additional discovery and a new round of briefing. D.E. 366, p. 7.

To resolve this preliminary matter, the Court held a status conference at which both parties asked the Court to rule on the basis of the briefs and all of the accompanying evidence without any further discovery, briefing, or evidentiary hearing. Minute Entry, April 3, 2025. The Court now does so.

## EVIDENCE

**Prison Schedule**. Both parties noted that the two different Estelle Unit prison schedules are largely identical and, in relevant part, are very similar to that used in the McConnell Unit. There is, however, one significant difference. Warden Newton testifies that the midnight count at the Estelle Unit is no longer a bed book count and therefore does not require inmates to be awakened. D.E. 358-2. Consequently, TDCJ argues that:

- Garrett can get a *minimum* of six hours and ten minutes of uninterrupted sleep if he is the last counted in the bed book count that starts at 8:30 p.m. and ends at 9:30 p.m. and the first to be awakened for breakfast at 3:40 a.m. D.E. 358-2, p. 3.

- He can get a *maximum* of nine hours and forty minutes of uninterrupted sleep if he is the first to be counted and the last to be awakened for breakfast. *Id.*, p.3 n.4.

- And if randomized (because the order of the count and the breakfast slots vary for security purposes), he can get eight hours of uninterrupted sleep per night on an *average* basis. *Id*.

In response, Garrett's affidavit dated September 19, 2024, describes his actual experience at the Estelle Unit, which controverts part of Warden Newton's testimony and the written schedule. Contrary to the prison schedule, rack-up is sometimes not completed until 11:00 p.m. (as opposed to the schedule of 10:30 p.m.) because of inadequate staffing. And the midnight count, which takes an hour, continues to be a bed book count during which the guards wake the inmates. *See* D.E. 361-3. He also complains that, contrary to the written schedule, showers start at 3:00 a.m.—prior to breakfast—and he cannot get one later in the day if he misses his time slot. *Id*. Therefore, his nighttime sleep is, at best, from 11:00 p.m. to midnight and then from 1:00 a.m. to 3:00 a.m. for a total of three hours, interrupted. D.E. 361-3.

TDCJ does not controvert Garrett's testimony regarding actual practices at the prison. It has admitted its significant understaffing in its answers to interrogatories. D.E. 350-3, p. 6. And it does not deny that understaffing affects the sleep schedule. By the same token, Garrett does not controvert TDCJ's testimony that, because he has no work assignment or other prison activities, he can also get over seven hours of sleep during the day between meals, albeit in three separate chunks of 30 minutes to four hours and 40 minutes, each. D.E. 358-2, p. 3.

**Excessive Noise**. Garrett complains that his sleep is further interrupted by excessive noise from hourly operation of the heavy metal doors and from inmate yelling. Warden Newton states that the noise from the opening and closing of cell doors is as quiet as possible without renovations that, even if available, would be prohibitively expensive. He

further testifies that the door operations do not occur around the clock. His testimony varies on the period during which the doors are not activated on an hourly basis.

- He states that the doors do not operate over the rack-up hours, which are only the four and one-half hours between 10:30 p.m. and 3:00 a.m. D.E. 358-1, D.E. 358-2, p. 2-3.

- He also states that the operational hours for the hourly opening and closing of the doors are only from 7:00 a.m. to 10:30 p.m., leaving eight and one-half hours of comparative silence. D.E. 358-2, p. 4.

Because the doors must be opened to allow inmates to go to breakfast as early as 3:00 a.m., Warden Newton appears to be denying "automatic" hourly operation of the doors between 3:00 a.m. and 7:00 a.m., during which time they must be manually opened for inmate traffic—causing the noise nonetheless. Otherwise, the door operation creates noise on an automatic hourly basis from 7:00 a.m. to 10:30 p.m.

As for inmate yelling, Warden Newton states that the staff already controls inmate noise to the extent possible, but admits that the unit is understaffed and that noise issues are not a high priority. D.E. 358-2, p. 4. He suggests that Garrett report the issue immediately when it happens or file grievances if there are particular instances he would like to complain of. D.E. 358-2, pp. 3-4. There is no mention in the record of the availability or efficacy of earplugs.

**Excessive Light**. Warden Newton states that cell lights can be turned off, but that common area lights must remain on for staff and inmate safety. He states that inmates successfully eliminate the sleep disturbance that could be caused by the light by putting a piece of clothing over their eyes. Garrett does not controvert this.

## STANDARD FOR EIGHTH AMENDMENT CLAIM

"To amount to cruel and unusual punishment, prison conditions must pose an unreasonable risk of serious damage to a prisoner's health—an objective test—and prison officials must have acted with deliberate indifference to the risk posed—a subjective test." *Garrett II*, 96 F.4th at 900 (quoting *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015), in turn quoting *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993)) (cleaned up). With respect to the objective test, an inmate need not prove actual harm, but only a substantial risk of serious harm. *Garrett II*, 96 F.4th at 900-01. With respect to the subjective test, we do not consider the prison's penological purposes for allowing the condition to prevail. *Id*. at 901-02.

## DISCUSSION

The parties did not offer any new evidence regarding the amount of sleep necessary to fulfill "the minimal civilized measure of life's necessities," for Eighth Amendment cruel and unusual punishment purposes. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Garrett's expert at trial, Candice Alfano, is a licensed clinical psychologist, University of Houston professor, and the director of the Sleep and Anxiety Center of Houston. She testified that studies have found an *association* between lack of sleep and a number of health conditions, of which Garrett complains. From those studies, a "robust relationship" between health and sleep was identified.

Professor Alfano highlighted that the American Academy of Sleep Medicine and the National Sleep Foundation issued a consensus statement that a minimum of seven (7) hours of sleep is necessary for *optimal* health. *See* Plaintiff's Exhibit 106, D.E. 293. At the same time, however, she testified that less than half of the population actually gets seven (7) or more hours of continuous sleep daily. This testimony—the only evidence of a link between sleep and health—is deficient in at least three respects.

**Insufficient Causal Link**. First, the studies on which Professor Alfano bases her opinion find only an association, not a cause-and-effect relationship, between the amount of continuous sleep and health disorders. According to the consensus statement on which she relies, "A clearer understanding of the precise biological mechanisms underlying sleep need continues to require further scientific investigation. . . . Research that directly examines the effects of sleep duration on health may lead to revisions of this recommendation in the future." D.E. 293, p. 2.

The studies also concede that age and a number of other factors contributed to a person's susceptibility to medical complaints as well as the ability to sleep. These variables were not quantified. Neither does the evidence address whether sleep aids, such as clothing over the eyes to block out light or earplugs to block out noise, have any effect on the quality or quantity of sleep and the ability to forestall health risks.

**Incorrect Side of the Spectrum**. Second, the message of both the studies and Professor Alfano's testimony goes to the issue of what sleep conditions are associated with the best health. They are designed to promote an aspirational goal and only provide a

"foundation for awareness." *See* D.E. 293, p. 2. They do not speak to the issue of what amount of sleep people in a civilized world must actually get before suffering significant health effects.

Indeed, the studies do not distinguish between routine and serious health risks. Thus, the evidence does not establish a standard for showing a deprivation of a life necessity or a threshold after which a substantial risk of serious harm occurs. The Eighth Amendment does not guarantee a right to optimum living conditions, but only freedom from cruel and unusual ones.

**Not the Civilized Measure of Life's Necessities**. Third, Dr. Alfano's testimony is self-defeating in that it acknowledges that the standard she advocates is not a standard most people in the civilized world experience. If less than half of the population gets the amount of sleep she advocates, her aspirational goal is not only on the wrong side of the spectrum, it is using the wrong prism. The Court is not tasked with determining the proper amount of sleep for humans in a perfect world, but is concerned with what is expected in the real world for a life to be civilized. If a majority of people do not get seven hours of sleep, then that benchmark is meaningless in terms of the civilized measure.

The Court acknowledges that "sleep undoubtedly counts as one of life's basic needs" and "[c]onditions designed to prevent sleep, then, might violate the Eighth Amendment." *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999). However, the evidence does not show that TDCJ has designed conditions for the purpose of preventing sleep. And while sleep is clearly important, the evidence is insufficient to demonstrate that any specific

number of hours of continuous sleep is the minimal civilized measure of life's necessities. To find an Eighth Amendment violation on this record would require the Court to speculate as to both the quantity of sleep that is required as well as how continuous that sleep must be before risking serious harm.

On the other hand, the evidence supports the fact that TDCJ is not denying Garrett the opportunity to sleep. It is just that the opportunity occurs in chunks throughout the day and night. *See* D.E. 361, p. 4. It is not requiring him to sleep with excessive noise if he has not ruled out the ability to employ earplugs or address situational complaints. And it is not requiring him to sleep with excessive light if he can cover his eyes with materials that will give him darkness.

With respect to the objective test, the Court **FINDS** that Garrett did not sustain his burden of proof to show that the prison conditions pose a substantial risk of serious harm by causing sleep deprivation. With respect to the subjective test, the evidence shows only that Garrett claimed that he was subject to such a risk and that, knowing of the *claim*, TDCJ offered no mitigation measures. But without any proof as to what threshold of sleep is required to avoid a substantial risk of serious harm, the Court cannot determine that TDCJ was aware of that threshold and was deliberately indifferent to it. Therefore, the Court **FINDS** that Garrett did not sustain his burden of proof to show that TDCJ was deliberately indifferent to a serious health risk.

## CONCLUSION

For the reasons set out above, the Court **HOLDS** that Garrett has failed to prove the elements of his claims and Defendant TDCJ is entitled to judgment against Garrett.

**ORDERED** on May 1, 2025.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE